[Cite as *State v. Davis*, 2013-Ohio-2539.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99023**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## VICTOR DAVIS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART,
REVERSED IN PART,
REMANDED FOR SENTENCING

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-554727 and CR-558926

**BEFORE:** E.T. Gallagher, J., Rocco, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** June 20, 2013

**ATTORNEY FOR APPELLANT**

Joseph Vincent Pagano
P.O. Box 16869
Rocky River, Ohio   44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    Edward Fadel
Assistant Prosecuting Attorney
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant Victor Davis ("Davis") appeals his theft conviction and sentence. We find some merit to the appeal and affirm in part and reverse in part.

{¶2} Davis was indicted in two separate cases. In Cuyahoga C.P. No. CR-554727, he was charged with one count of theft in violation of R.C. 2913.02(A)(3), a fifth-degree felony. The victim in that case was American Federation of Governmental Employees, Local 3283 ("AFGE Local"). In Cuyahoga C.P. No. CR-558926, Davis was charged with one count of theft in violation of R.C. 2913.02(A)(3), a fourth-degree felony. The victim in that case was the U.S. Department of Defense — Defense Finance and Accounting Services ("DFAS"). The charges arose from Davis's misuse of DFAS's time-keeping system, which is used for payroll calculations. The state alleged that by deception, Davis received compensation for work he did not perform.

{¶3} Davis worked for DFAS in Cleveland from November 1988 until 2010. From 1997 through 2009, Davis was president of AFGE, Local 3283 and was also an officer of the National Union, Council 171 ("Council 171"). Davis lost the local union election in May 2009 and was required to return to regularly assigned duties as a military pay technician. During his tenure as the local union president, Davis was compensated as a full-time employee under the code RGBD, which indicates the employee is performing union work. This code is referred to as "official time." An employee's time

spent performing regularly assigned work is indicated by the code RG. Annual vacation time, sick leave, and holidays are also tallied in the DFAS's time-keeping system.

{¶4} At trial, Chester Boutelle Jr. ("Boutelle"), former deputy director for DFAS in Cleveland, testified that in May 2009 he informed Davis that he would be afforded a two-week transition period to assist the newly elected local union president before returning to his regular duties. Davis was entitled to 100 percent official time during this two-week period. Boutelle explained that after the transition period ended, Davis would work as a military pay technician processing military pay for active members of the United States military. Boutelle assured Davis that he would receive on-the-job training.

{¶5} Davis admitted at trial that he never performed any of the duties of a military pay technician. He testified that his supervisors never provided him with a computer or telephone, and they never assigned him any work. Yet, his time sheets indicated that he was paid on a regular basis from May 2009, when he lost the election, through May 2010. None of his time sheets during that period contained the code RG, which would have indicated that he performed any regular, non-union, work.

{¶6} Although Davis lost the union presidential election, he maintained a position as secretary of Council 171. Davis was permitted to use "official time" when he performed union work as an officer of Council 171, a branch of the national union. With the exception of Davis, all the witnesses agreed that Davis's union responsibilities would consume approximately 50 percent of his time. These witnesses also agreed that there

was a three-month break during the period from September 2009 through May 2010, during which Davis was not required to perform any union work.

{¶7} John Kern ("Kern"), a human resources specialist, and Sherman Patton ("Patton"), chief of personnel and security of DFAS, investigated reports that Davis was abusing official time on his time sheets. Davis's time sheets revealed that he had 600 hours of authorized official time and 636 hours of unauthorized official time. Kern stated that the 636 hours of unauthorized official time should have been recorded as "absent without leave" and therefore without pay. Patton testified that Davis was primarily an employee of the agency and that he needed prior approval of official time. When he was not performing union activities, he should have been performing his regular assigned duties and coded such time as RG on his time sheets.

{¶8} In describing the procedure for obtaining approval of official time, Patton explained that senior negotiators for both DFAS and the union first notify the labor relations office of the DFAS of the employees needed for negotiations. The notice includes the dates of scheduled negotiating sessions and any preparatory time associated with those negotiations. The labor relations office then communicates the request to the employee's supervisor, and the supervisor provides the final approval. According to Patton and Darlene Asberry ("Asberry"), Davis's immediate supervisor, Davis never requested approval of official time.

{¶9} When Patton confronted Davis about his misuse of official time, Davis denied the allegation and asserted that he was charging his time as regular time. Seeking

clarification, Patton asked Davis: "So you're charging your time as regular time to your normally-assigned duties?" To which Davis replied, "Yes, I am." (Tr. 292.)

{¶10} Asberry and Patricia Edwards ("Edwards"), a lead military pay technician, testified that they thought Davis was still entitled to 100 percent official time because he was performing union duties. Asberry approved Davis's time sheets for 17 pay periods, which Edwards submitted on his behalf as a "surrogate" technician. No one informed Asberry as to how Davis should have coded his time after losing the union presidential election. Davis left a sign on his cubicle indicating he was away on union business, and Asberry rarely saw him in the office. She testified that Davis never requested training or any work assignments. However, when upper-level supervisors informed Asberry that Davis needed to be trained, she eventually began training Davis in the fall of 2010.

{¶11} Several witnesses testified for the defense. Frank Rock ("Rock"), who works in the accounts payable directorate of the DFAS and is the former president of the DFAS AFGE Council, testified that he was designated as the chief negotiator for all union matters relating to the agency while Davis was the executive secretary. Rock stated that during the period from September 2009 to May 2010, the union had sporadic contract negotiations, including a three- month break. According to Rock, 50 percent of Davis's time was spent on union negotiations and the other 50 percent should have been spent in his local office.

{¶12} The jury found Davis guilty of theft in violation of R.C. 2913.02(A)(3), a fourth-degree felony, as charged in the indictment in CR- 558926. Davis subsequently

pleaded guilty to attempted theft, in violation of R.C. 2923.02 and 2913.02(A)(3), a first-degree misdemeanor, in CR-554727. The court sentenced Davis to two years of community control sanctions and ordered him to pay restitution in the amount of $13,635 in CR-558926, and $1,358.26 in CR-554727. Davis now appeals and raises five assignments of error.

### Sufficiency and Manifest Weight

{¶13} In the first assignment of error, Davis argues there was insufficient evidence to support his theft conviction. He contends there was no evidence that he purposely deprived DFAS of any money by deception, and there was no evidence proving what amounts, if any, he was overpaid during the relevant time period. He contends the overuse of official time on his time sheets was a coding error and not a crime.

{¶14} In the second assignment of error, Davis argues that his theft conviction is against the manifest weight of the evidence. However, he does not raise any new issues and reiterates the same arguments raised in his first assignment of error with respect to sufficiency of the evidence. Therefore, although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these assigned errors together, while applying the distinct standards of review to Davis's arguments. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶15} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 942 (1991), paragraph two of the syllabus.

{¶16} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, *supra*; *Thompkins* at 386-387. When reviewing a claim that the judgment was against the manifest weight of the evidence, we review the entire record, weigh both the evidence and all the reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387.

{¶17} Davis was convicted of one count of theft, in violation of R.C. 2913.02(A)(3), which states that "[n]o person, with purpose to deprive the owner of property * * * shall knowingly obtain or exert control over * * * the property * * * [b]y deception."

{¶18} Davis argues the state failed to prove that he acted purposely. R.C. 2901.22, which defines culpable mental states, provides, in relevant part:

> (A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
>
> (B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a

certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

**{¶19}** R.C. 2913.01(A) defines "deception" as

knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.

**{¶20}** As defined in R.C. 2913.01(C), "deprive" means to do any of the following:

(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;

(2) Dispose of property so as to make it unlikely that the owner will recover it;

(3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.

**{¶21}** The state accused Davis of purposely receiving compensation from his employer, DFAS, without performing any duties for his employer from September 1, 2009 to May 22, 2010. Although there is no direct evidence proving Davis's intent to deprive the DFAS of money without giving proper consideration, we find there is sufficient circumstantial evidence of his guilt. We also find that the weight of the evidence supports his conviction.

**{¶22}** Boutelle testified that he personally informed Davis that he was required to return to his regular non-union work after a two-week transition period following the

election of the new local union president. Therefore, despite an apparent lack of communication among DFAS management supervisors, and despite the fact that his immediate supervisor believed he was still entitled to 100 percent official time, Davis knew he was supposed to resume regular work as a military pay technician. Yet he admitted that from September 2009 to May 2010, he never performed any assignments as a military pay technician.

{¶23} Boutelle and Patton testified that although Davis was authorized to use some official time to perform union work as Council 171's secretary, his time spent on union work should never have exceeded his time spent on his "in house duties." Even Rock, who testified for the defense, stated that during the time period from September 2009 to May 2010, Council 171 met approximately two weeks per month, except for a three-month break during which it did not meet at all. Rock further stated that during the two-week period each month when Council 171 was not involved in contract negotiations, officers of the council returned to their regular jobs. He agreed that "the Council doesn't require 100 percent of your time."

{¶24} Asberry and another supervisor, Mark Rudolph ("Rudolph"), were responsible for ensuring that employee time, including Davis's time, was coded properly. Although Boutelle instructed Davis to report for regular work, Davis never informed his supervisors about the change in his employment status, which now required him to produce for the agency in exchange for compensation. By withholding this information,

Davis misled his supervisors into believing that he was still authorized to work exclusively on union business.

**{¶25}** Davis, who testified on his own behalf, stated that he continued to perform union work in the office because his supervisors prevented him from performing regular assignments by failing to provide him with a computer, a telephone, and training. However, Asberry testified that not only was she under the impression that Davis was still entitled to 100 percent official time, but Davis rarely made an appearance in the office, and he kept a sign on his cubicle indicating that he was away on union business. Asberry also testified that Davis never asked for training or work.

**{¶26}** Davis also testified that he did not know that surrogate employees had been encoding his time as 100 percent official time. However, Edwards testified that employees are responsible for filling out their own time cards. A surrogate only inputs time for another employee if the employee is unable to fill out his own time card. Edwards further testified that Davis often called her to confirm that she was submitting his time sheets. (Tr. 265.) Asberry instructed Edwards, who was an authorized surrogate, to fill out Davis's time cards because Asberry believed he was still exclusively performing union duties.

**{¶27}** When confronted about his overuse of official time, Davis told Patton that he was charging his time as regular time on his time sheets. Thus, he told Patton that not only was he performing regular work, he stated that he was inputting the RG code on his own time cards. However, not a single RG code appears on any of Davis's time sheets,

which were admitted into evidence. We find this evidence is sufficient to establish that Davis purposely decided not to inform his supervisors that he was required to perform regular assigned work in the office and was no longer entitled to 100 percent official time so that he could receive 100 percent official time.

{¶28} Davis further argues that even if there is sufficient evidence to prove that he committed theft, there is insufficient evidence proving what amounts, if any, DFAS overpaid him. However, as part of the criminal investigation, Kern reviewed Davis's employment records and learned that he was being compensated at a rate of $21.44 per hour. He also discovered that Davis's entire time-keeping record indicated that he was paid exclusively for official time, annual leave, and holidays, but no regularly assigned work. After accounting for authorized official time, Kern determined that Davis was paid $13,650 for 636 hours of unauthorized official time. We find Kern's testimony sufficient to establish the amount DFAS paid Davis for unauthorized official time.

{¶29} We also find it reasonable for the jury to conclude that Davis's testimony was not credible. Davis asserted that he was entitled to official time for union work he performed while sitting at his assigned desk. Although several witnesses testified that they had seen Davis in the office, his appearances were rare. Davis's testimony that he did not know a surrogate was erroneously coding his time sheets for almost nine months is far-fetched in light of the other evidence. Several witnesses testified they were misled to believe that Davis was still entitled to 100 percent official time and that Davis never

sought any regular work. Therefore, we find that Davis's theft conviction was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶30} The first and second assignments of error are overruled.

## Restitution

{¶31} In the third assignment of error, Davis argues the trial court erred by ordering restitution in violation of R.C. 2929.18. However, because Davis failed to object to the restitution order, he waived all but plain error.

{¶32} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. In order to find plain error under Crim.R. 52(B), it must be determined that, but for the error, the outcome of the proceedings clearly would have been otherwise. *Id.* at paragraph two of the syllabus.

{¶33} Davis contends the court's restitution order violates R.C. 2929.18(A)(1) because the court failed to identify the source it used to determine the amount. R.C. 2929.18(A)(1) provides in relevant part:

> Restitution by the offender to the victim of the offender's crime * * * in an amount based on the victim's economic loss. * * * If the court imposes restitution, at sentencing, the court shall determine the amount of restitution to be made by the offender. If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, * * * and other

information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold a hearing on restitution if the offender, victim, or survivor disputes the amount.

"Economic loss" is defined as "any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense and includes * * * any property loss * * * incurred as a result of the commission of the offense." R.C. 2929.01(L).

{¶34} Although Davis disputed the amount of unauthorized official time at trial, he did not object to the restitution order. As previously stated, Kern investigated the amount of unauthorized official time for which Davis was paid and testified that the DFAS paid him $13,650 for unauthorized time. Kern reached this figure after reviewing a list of approved union business time, Davis's employment records, and speaking with labor relations personnel. Therefore, the trial court's judgment ordering Davis to pay restitution in the amount of $13,650 to DFAS was not in excess of the economic loss the DFAS suffered as a result of Davis's action.

{¶35} With respect to the order of restitution in the amount of $1,358 in CR-554727, Davis specifically agreed to this amount as part of his plea agreement. In *State v. Hody*, 8th Dist. No. 94328, 2010-Ohio-6020, this court held that where the state and defense entered into a stipulation as to the amount of restitution in a plea agreement, the parties' stipulation to the amount serves as sufficient basis to support the trial court order and "precludes defendant from complaining about it now on appeal." *Id*. at ¶ 25.

{¶36} Therefore, the third assignment of error is overruled.

## Ineffective Assistance of Counsel

{¶37} In the fourth assignment of error, Davis argues he was deprived of his constitutional right to the effective assistance of counsel. He contends his trial counsel was ineffective for failing to object to the trial court's restitution orders. He also contends that his trial counsel's faulty interrogation of witnesses caused the court to sua sponte object on several occasions and that the court's interruptions prejudiced the defense.

{¶38} To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. A defendant must show that counsel acted unreasonably and that, but for counsel's errors, there exists a reasonable probability that the result of the proceeding would have been different. *Strickland* at 696; *Bradley* at paragraph three of the syllabus. In making this determination, the reviewing court must presume that counsel's conduct was competent. *Id*.

{¶39} Davis's trial counsel's failure to object to the restitution orders did not result in the ineffective assistance of counsel. As previously stated, Kern established the amount of restitution after reviewing authorized time, employment records, and Davis's time sheets. And Kern was subject to cross-examination. Having heard the evidence, the trial court was informed of the value of loss and the method used for calculating the

loss. Therefore, even if Davis's trial counsel had objected to the restitution order, it would not have changed the trial court's judgment.

{¶40} Davis's trial counsel was also not ineffective for choosing not to object to the restitution order in CR-554727 because the parties stipulated to that amount in the plea agreement. Therefore, we find that Davis's trial counsel was not ineffective for failing to object to the trial court's restitution order.

{¶41} Finally, the trial court's sua sponte objections did not render Davis's trial counsel ineffective. The court only objected to the form of trial counsel's questions, not the evidence itself. The court always afforded Davis's trial counsel the opportunity to rephrase the question. Moreover, the court acknowledged its interruptions and instructed the jury: "I certainly do not have any grudge against either side in this case. It's just my job to rule on the laws and make rulings on evidentiary questions." (Tr. 557.) A jury is presumed to follow the instructions given to it by the trial judge. *State v. Henderson*, 39 Ohio St.3d 24, 33, 528 N.E.2d 1237 (1988).

{¶42} Therefore, we cannot say that Davis's trial counsel's interrogation of certain witnesses was ineffective and unfairly prejudiced the defense.

{¶43} Accordingly, the fourth assignment of error is overruled.

**Union Activities Prohibited**

{¶44} In the fifth assignment of error, Davis argues the trial court erred when it prohibited him from participating in union activities as a condition of his community

control sanctions. He contends this condition is overly broad, vague, and violates his constitutional rights to freedom, speech, assembly and association.

**{¶45}** R.C. 2929.15(A)(1) vests the trial court with discretion to impose any condition of community control sanctions it deems appropriate. *State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201, *reaffirming State v. Jones*, 49 Ohio St.3d 51, 52, 550 N.E.2d 469 (1990). However, the trial court's discretion is not limitless. In *Talty*, the Ohio Supreme Court held that conditions of probation must be reasonably related to the three probationary goals articulated in *Jones*. In determining whether a condition reasonably relates to those probationary goals, the *Talty* court held that trial courts must consider (1) whether the condition "is reasonably related to rehabilitating the offender, (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation." *Id*. at ¶ 12. The *Talty* court cautioned that probation conditions must "not be overly broad so as to unnecessarily impinge upon the probationer's liberty." *Id*. at ¶ 13.

**{¶46}** Here, the trial court's order prohibiting Davis from participating in union activities is overly broad and does not achieve any of the probationary goals of rehabilitation. Davis lost his job as a result of his convictions. According to his statements at the sentencing hearing, he also lost his pension. Prohibiting Davis from associating with union members will preclude him from using his contacts to find new employment. New employment may have the greatest rehabilitative impact on Davis

because it would not only allow him to correct his previous wrongs, but it would deter him from committing future crimes and suffering further economic loss as a result.

**{¶47}** The prohibition on Davis's union involvement is also not calculated to prevent future crime. Although Davis used his union activities as a guise to deceive his employer and commit theft, he has now lost his job and is no longer in a position to use the union for fraudulent purposes. Because the condition prohibiting Davis from associating with union members does not serve a probationary goal, we find the trial court abused its discretion when it imposed that condition.

**{¶48}** Accordingly, we sustain the fifth assignment of error.

**{¶49}** We affirm the trial court's judgment in part and remand the case to the trial court with instructions for the court to vacate the condition of Davis's community control sanctions that prohibits him from participating in union activities.

**{¶50}** Judgment affirmed in part, reversed in part, and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

KENNETH A. ROCCO, P.J., and
PATRICIA A. BLACKMON, J., CONCUR